989 F.2d 498
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 Cleo WRAP, a Division of Gibson Greetings, Inc., Plaintiff-Appellant,
v.
UNITED PAPER WORKERS INTERNATIONAL UNION, AFL-CIO, LOCAL
UNION 1766, Defendant-Appellee.
 
 Nos. 92-5031, 92-5032.
 United States Court of Appeals, Sixth Circuit.
 March 24, 1993.
 Before NELSON and BATCHELDER, Circuit Judges, and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 This is an appeal from a summary judgment granting enforcement of a labor arbitration award. The governing collective bargaining agreement gave the employer the right to terminate the employment of disabled employees whom the company determined to be permanently incapable of performing their job requirements. The grievant in this case had been disabled by a back injury that required two lumbar disc operations, and his employment was terminated after the company determined--"acting in good faith upon the best medical information then available," as the arbitrator found--that the disability was permanent.
 
 
 2
 One week after the termination, the neurosurgeon who performed the disc operations (and who had certified that the grievant had a permanent partial disability) concluded that the grievant could resume his regular duties, without restrictions, as of the following day. On the strength of this post-termination medical evaluation the arbitrator ordered that the grievant be returned to his former employment with back pay. The back pay was to run not from the date of termination, but from the date on which the doctor subsequently cleared the grievant for return to work without restrictions.
 
 
 3
 The question presented on appeal, as we see it, is whether the arbitrator was even arguably acting within the scope of his authority in ordering that the grievant be reinstated subsequent to a lawful termination of his employment. We think that the answer to this question is "no." The arbitrator was administering his own brand of industrial justice, in our view, and his award did not draw its essence from the collective bargaining agreement. We shall therefore reverse the judgment in which the award was enforced.
 
 
 4
 * In January of 1987 plaintiff Cleo Wrap, a division of Gibson Greetings, Inc., entered into a collective bargaining agreement with the United Paper Workers International Union, AFL-CIO, and one of its local unions. The agreement remained in force at all times pertinent to this case.
 
 
 5
 Article VI of the agreement, which deals with seniority, contains a section setting forth a number of conditions under which an employee's seniority is to be terminated. The final such condition reads, in pertinent part, as follows:
 
 
 6
 "[E]mployees who sustain a work related injury and are unable to work shall retain their seniority until such time as it is determined[1] that they are permanently incapable of performing their job requirements. At that time they shall be removed from the Seniority List." Art. VI, § 11(f).
 
 
 7
 The arbitrator equated removal from the seniority list with termination of employment. The employee with whom we are concerned here, a man named Lonnie Chalmers, worked for Cleo Wrap as a casemaker. His job required him to lift rolls of cellophane film that weighed 80 to 90 pounds. While lifting such a roll on May 17, 1987, Mr. Chalmers injured his lower back.
 
 
 8
 Mr. Chalmers was referred first to a company doctor and then to D.J. Canale, M.D. Dr. Canale, a neurosurgeon, performed two separate lumbar disc operations on Mr. Chalmers in 1987. On March 21, 1988, about four months after the second surgery, Dr. Canale cleared Mr. Chalmers for return to work subject to the restriction that he lift no more than 30 to 40 pounds. Dr. Canale concluded at this time that Mr. Chalmers "has incurred 15% permanent partial disability to the body as a whole and this would be based on both back surgeries and in keeping with AMA guidelines."
 
 
 9
 Mr. Chalmers returned to Dr. Canale on April 18, 1988, and told the doctor "that he was not allowed to come back to work with any restrictions and that, moreover, he continues to have pain if he does any lifting even up to only about 10 lbs." In a note which, like that prepared on March 21, indicated that a copy was sent to the company doctor, Dr. Canale reported that he told Mr. Chalmers that the "restrictions on his back ... in my opinion are permanent." The note also indicated that litigation--presumably meaning a workers' compensation proceeding--was pending.
 
 
 10
 On June 3, 1988, Mr. Chalmers agreed to a court-administered settlement of all claims arising out of his job-related injury. (The arbitrator's award tells us that the amount of the settlement--$46,499, according to the district court--was geared to a permanent partial disability of 50 percent.) Following the settlement, Cleo Wrap sent Mr. Chalmers a letter advising him that it was removing his name from the seniority list, thereby terminating his employment, effective July 11, 1988.
 
 
 11
 Seven days later Dr. Canale signed a form certifying that he had examined Mr. Chalmers on July 18, 1988. The doctor checked boxes on the form indicating that in his professional opinion the patient "[h]as now recovered sufficiently to return to work [with no restrictions] as of 7-19-88." In a brief supplement dated October 4, 1988, Dr. Canale certified that Mr. Chalmers "appears to have recovered completely from his lumbar disc surgery and is having no significant pain or limitation of function...."
 
 
 12
 Mr. Chalmers' union instituted grievance proceedings on the same day on which Dr. Canale conducted his initial post-termination medical evaluation. The grievance went to arbitration before Mr. Ed W. Bankston, who rendered the award that is before us in this appeal.
 
 
 13
 The parties stipulated that the issue to be decided by the arbitrator was "[w]hether the grievant, Lonnie Chalmers, was discharged in conformance with the collective bargaining agreement...." The arbitrator began his analysis of this issue by acknowledging that the company had determined on July 11, 1988, that Mr. Chalmers was permanently incapable of performing his job requirements. The arbitrator did not question the proposition that the July 11 determination warranted the company's action in removing Mr. Chalmers from the seniority list, thereby terminating his employment. On the contrary, the arbitrator expressly found, as we have seen, that in making its determination the company appeared "to have been acting in good faith upon the best medical information then available...."
 
 
 14
 Nevertheless, because Dr. Canale determined subsequent to the termination that Mr. Chalmers could return to his job without restrictions, and because the company failed to rebut the new evidence that Mr. Chalmers was not in fact "permanently incapable" of performing his work as a casemaker, the arbitrator concluded that an obligation to return Mr. Chalmers to his job arose as of July 19, 1988. The award was couched in these terms:
 
 
 15
 "[I]t is the Award of the undersigned Arbitrator that the grievance of Mr. Lonnie Chalmers be sustained, and that the grievant be reinstated immediately to his former employment with the Company as a casemaker, with complete restoration of seniority and all other contractually specified benefits, plus back pay since the date of the Company's first obligation to return him to his job which was determined by Dr. D.J. Canale as July 19, 1988."
 
 
 16
 The company brought suit under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, seeking to have the arbitration award set aside as having been made in excess of the arbitrator's authority. On cross-motions for summary judgment the district court declined to vacate the award, granting enforcement instead. This appeal followed.
 
 II
 
 17
 The scope of our review of labor arbitration awards is quite narrow. For more than 30 years it has been the rule that an arbitration award should be upheld unless it fails to "draw its essence from the collective bargaining agreement." United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597 (1960). See United Paperworkers v. Misco, 484 U.S. 29, 38 (1987), where the Supreme Court expressed itself as follows:
 
 
 18
 "[T]he arbitrator's award settling a dispute with respect to the interpretation or application of a labor agreement must draw its essence from the contract and cannot simply reflect the arbitrator's own notions of industrial justice. But as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision.
 
 
 19
 * * *
 
 
 20
 * * *
 
 
 21
 "The arbitrator may not ignore the plain language of the contract; but the parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract."
 
 
 22
 Even after Misco, of course, an arbitration award may be vacated if it is in direct contradiction of unambiguous terms of the agreement, or if the arbitrator has ignored or refused to apply explicit terms of the agreement, or if the arbitrator has in essence created a new contract term not found in the agreement negotiated by the parties. International Assoc. of Machinists v. Lourdes Hospital, Inc., 958 F.2d 154, 156-57 (6th Cir.1992). See also AP Parts Co. v. UAW, 923 F.2d 488, 491 (6th Cir.1991) (arbitrator cannot ignore the plain language of the contract); IBEW v. Toshiba America, Inc., 879 F.2d 208, 210-11 (6th Cir.1989) (same).
 
 
 23
 In the case at bar, it seems to us, the arbitrator in essence created a new contract term. The contract that the parties negotiated says in Article VI, § 11 that an injured employee will be retained on the seniority list until such time as the company determines him to be permanently incapable of performing his job. When the company makes that determination, the contract says, the injured employee "shall" be taken off the list, his employment thereby being terminated. The contract does not say that a person whose employment has been properly terminated will be taken back if his disability subsequently turns out not to have been permanent after all. The arbitrator nonetheless wrote such a provision into the contract, in effect, when he ordered that Mr. Chalmers be returned to his former employment.
 
 
 24
 It bears emphasis, in this connection, that the company's determination of July 11, 1988, was perfectly legitimate when made, even if Mr. Chalmers made a sudden and complete recovery one week later. Mr. Chalmers had acknowledged having a permanent partial disability when he accepted the workers' compensation award. The best medical evidence available on July 11 showed a permanent partial disability. And the arbitrator found that the company appeared to have been acting in good faith in determining, on the basis of that evidence, that Mr. Chalmers was permanently incapable of performing his job.[2] Given the plain language of the collective bargaining agreement and the factual findings of the arbitrator, it is simply not arguable, in our view, that the company committed a breach of the agreement when it terminated Mr. Chalmers' employment on July 11.
 
 
 25
 The logic of the arbitrator's decision is that the company violated some unspecified term of the collective bargaining agreement on July 19--eight days after the discharge--when the company failed to give Mr. Chalmers his job back in light of his sudden recovery. The problem, of course, is that nothing in the contract required the company to give Mr. Chalmers his job back following a just and lawful termination of his employment. The arbitrator points to no such requirement, the union points to no such requirement, and we have found none.
 
 
 26
 We acknowledge that labor arbitrators have very broad authority to interpret--or misinterpret--the language of collective bargaining agreements. See, for example, Interstate Brands Corp. v. Chauffeurs, Teamsters, Warehousemen and Helpers Local Union No. 135, 909 F.2d 885 (6th Cir.1990), cert. denied, 111 S.Ct. 1104 (1991); Dixie Warehouse and Cartage Co. v. General Drivers, Warehousemen and Helpers, Local Union No. 89, 898 F.2d 507 (6th Cir.1990); Eberhard Foods, Inc. v. Handy, 868 F.2d 890 (6th Cir.1989). Arbitrators have no authority, however, to manufacture contractual obligations out of whole cloth. That is what the arbitrator did in the case at bar, and his decision cannot stand.
 
 
 27
 The judgment of the district court is REVERSED, and the case is REMANDED with instructions to vacate the arbitration award.
 
 
 28
 DAVID A. NELSON, Circuit Judge, dissenting.
 
 
 29
 The arbitrator interpreted the collective bargaining agreement as meaning, among other things, (1) that removal from the seniority list because of inability to work following a work-related injury amounts to the same thing as a discharge for just cause; (2) that a decision to discharge an employee for just cause is subject to review through the contractual grievance procedure, a procedure that culminates in final and binding arbitration; and (3) that where such a decision goes to arbitration, its validity is to be determined in light of all information available at the time of the arbitration, and not simply in light of the information available when the company made its decision.
 
 
 30
 My colleagues on the panel have suggested that the last of these interpretations amounts to the unauthorized addition of a new contract term. With respect, I disagree. It is true that nothing in the collective bargaining agreement required the company to give Mr. Chalmers his job back following a just and lawful termination of his employment. It is also true, however, that nothing in the agreement purported to limit the evidence to which the arbitrator could look in determining whether Mr. Chalmers' discharge had in fact been "just."
 
 
 31
 Section 1 of Article IX of the collective bargaining agreement reads as follows:
 
 
 32
 "In the event an employee shall be discharged by the Company and if the Union believes that he has been dealt with unjustly, such discharge shall be placed before the Union and Company Committee under Step 3 of the grievance procedure. In the event it should be decided that an injustice has been dealt an employee with regard to the discharge, the Company shall reinstate the employee without loss of seniority and with full compensation for working hours lost."
 
 
 33
 The arbitrator read this provision as authorizing him to decide, in the light of subsequent developments, whether a discharge that seemed just when announced was not what it seemed to be. The arbitrator's interpretation of the contract may have been wrong, just as his factual determination may have been wrong; in my view, however, the arbitrator was at least arguably applying the contract and acting within the scope of his authority. Under United Paperworkers v. Misco, 484 U.S. 29 (1987), I believe that we are thus precluded from overturning the arbitrator's decision. It is not a court's interpretation of the contract for which the parties bargained, as the Supreme Court has repeatedly reminded us, it is the arbitrator's.
 
 
 
 [1]
 Elsewhere in the same article it is provided that "For all purposes of this article, the Company shall make the determination whether or not the employee is qualified and able to properly and efficiently perform the particular work required." Art. VI, § 6
 
 
 [2]
 Article IX, § 1 of the collective bargaining agreement provides for reinstatement of an employee who has been discharged unjustly, but the arbitrator did not purport to find that Mr. Chalmers had been dealt an injustice with regard to the discharge as such